Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona 85012-2334
Telephone: (602) 264-4965
Arizona State Bar No. 007356
Facsimile: (602) 277-0144
E-mail: Michael@mcarmellaw.com

Proposed Attorney for Debtor

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>CASA de CAPRI ENTERPRISES, LLC<br>dba Capri at the Pointe Rehab,<br><br>Debtor. | Chapter 11 Proceedings<br><br>Case No. 2:13-bk-14269-EPB<br><br>**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS:**<br><br>**(A) AUTHORIZING POSTPETITION FINANCING ON A SENIOR SECURED BASIS;**<br><br>**(B) AUTHORIZING USE OF CASH COLLATERAL;**<br><br>**(C) GRANTING ADEQUATE PROTECTION;**<br><br>**(D) GRANTING RELATED RELIEF; AND**<br><br>**(E) SCHEDULING A FINAL HEARING** |

CASA de CAPRI ENTERPRISES, LLC dba Capri at the Pointe Rehab, an Arizona limited liability company ("Debtor"), by and through undersigned counsel, hereby moves this Court for immediate entry of an interim order substantially in the form attached to this Motion as **Exhibit A** (the "**Interim Order**"), and after a final hearing on this Motion (the "**Final Hearing**"), entry of a final order (the "**Final Order**," and together with the Interim Order, collectively, the "**DIP Orders**") (a) authorizing the Debtor to obtain postpetition financing on a senior secured

PHOENIX/642212.1/396239

and superpriority basis in accordance with the terms of a postpetition DIP loan {the "**DIP Loan**") consistent with the terms of the DIP Commitment Letter (as defined below and attached to this Motion as **Exhibit B**), (b) authorizing the Debtors to use Cash Collateral (as defined below), (c) granting adequate protection to the Prepetition Lenders (as defined below) with respect to, *inter alia*, such use of Cash Collateral and any diminution in the value of the Lender's interests in their prepetition collateral, including Cash Collateral, (d) prescribing the form and manner of notice and setting the time for the Final Hearing, and (e) granting certain related relief. This Motion is brought on an emergency basis to avoid irreparable harm to this estate and is supported by the contemporaneously-filed *Declaration of Gregory S. Anderson In Support of Chapter 11 Petition and First Day Motions* (the "**Anderson Declaration**"), the entire record before the Court, and by the following memorandum of points and authorities.

## **RULE 4001 & LOCAL RULE 4001-4(b) DISCLOSURES**

1. In accordance with the disclosure requirements of Rule 4001(b), (c) and (d) and Local Rule 4001-4(b), the material terms of the DIP Commitment Letter are as follows.[1]

|  | **DIP FINANCING TERMS** |
|---|---|
| **Borrower** | Casa de Capri Enterprises, LLC dba Capri at the Pointe Rehab (the "**Debtor**") |
| **Lender** | Fay Enterprises, Inc. or an affiliated entity ("**Lender**") |
| **Loan** | Revolving Loan |
| **Interim Availability** | Up to $100,000.00 |

---

[1] This summary is qualified in its entirety by the provisions of the DIP Commitment Letter. Capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the DIP Commitment Letter. To the extent there are any conflicts between this summary and the DIP Commitment Letter, the terms of the DIP Commitment Letter shall govern.

2

| | |
|---|---|
| **Final Availability** | Up to a total of $200,000.00, including amounts borrowed under the Interim Availability |
| **Use of Proceeds** | Proceeds of the DIP Loan shall only be utilized as follows: (i) payment of monthly premium for liability insurance of $30,000(ii) food for patient care (iii) medical supplies for patient care (iv) pharmacy costs for patient care; and (v) direct therapy costs for patient care, and (vi) payroll expense, payroll taxes and benefits for employees of the Facility, all in accordance with a cash flow budget (the "**Budget**") prepared by the Debtor, in form and substance acceptable to the Lender) both to the extent cash from operations or otherwise is not available to cover such expenses. A copy of the approved Budget is attached to this motion as Exhibit "1". |
| **PAYMENTS AND Due Date** | All funds received from post-petition receivables shall be first applied against the DIP Loan; first to accrued and unpaid interest and then to principal. Any and all then current outstanding principal amount of the DIP Loan plus any unpaid accrued interest shall become due and payable in cash upon the earlier of (the "**Due Date**"): (i) the date that is ninety (90) days after the commencement of the Debtor's bankruptcy case; (ii) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the effective date) of a plan of reorganization that is confirmed pursuant to an order of the Court; (iii) forty-five (45) days after the entry of the Interim Order if the Final Order has not been entered prior to the expiration of such forty-five (45) day period; The foregoing notwithstanding, at the sole option of the Lender, the DIP Commitment Letter may serve as the DIP Credit Agreement. |
| **Interest Rate** | The outstanding principal balance due under this DIP Loan shall bear interest at the fixed rate of 10% per annum. The interest rate shall be calculated on the basis of a 365/365 day year. Upon and for the duration of an occurrence of an Event of Default (described below), the interest rate shall be the Interest Rate plus Four Hundred (400) basis points. Interest shall be due and payable, in arrears, and if not sooner paid, not later than the Due Date |

| | |
|---|---|
| **Collateral, Priming Liens, and Super-Priority Administrative Claims** | The DIP Loan shall be secured by: (i) a perfected first priority lien on any and all post-petition assets of the Debtor of any nature or type whatsoever including, without limitation, accounts receivable, inventory, customer lists, intellectual property, minerals, mineral rights, plant and equipment patents, trade secrets, property and/or leasehold rights, all other tangible and intangible assets, and any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, excluding recoveries pursuant to Chapter 5 of the Bankruptcy Code (ii) control over the Debtor's bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature (collectively the "DIP Loan Collateral"). Debtor shall take any steps requested by the Lender, including the execution of Control Agreements and Pledge Agreements to assure that the Lender's interest in the DIP Loan Collateral is perfected<br><br>The DIP Loan shall be authorized pursuant to Bankruptcy Code section 364(c)(1) to be incurred as, and shall constitute, claims with a priority over all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b) of the Bankruptcy Code.<br><br>The security interests and liens in the DIP Loan Collateral securing the DIP Loan shall be authorized pursuant to section 364(c)(2), (3), and 364(d) of the Bankruptcy Code to constitute a lien on and in the DIP Loan Collateral ranking prior to all other claims and liens of the Debtor (the "DIP Priming Lien"). The DIP Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under the Debtor's pre-petition credit agreements. The DIP Priming Lien shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the Lender. No other security interests or consensual liens (whether under Bankruptcy Code section 364 or otherwise) shall be permitted on the DIP Loan Collateral. |

4

| | |
|---|---|
| **Affirmative and Negative Covenants** | The DIP Credit Agreement shall contain usual and customary affirmative and negative covenants for transactions of this nature. |
| **Events of Default** | The DIP Loan shall contain usual and customary events of default for transactions of this nature including, without limitation, failure by the Debtor to make payments of principal, interest, and/or fees within five (5) days after the same are due, default by the payment of any post-petition debt not approved by the Lender in excess of $1,000.00 breach of any covenant or representation, default on any other contract, material adverse change (including but not limited to litigation), the Bankruptcy Case of the Debtor shall be dismissed or converted to a Chapter 7 case, and a Fundamental Change. "Fundamental Change" shall include without limitation any merger or other change of control transaction. |
| **Default Remedies** | The DIP Facility shall contain usual and customary default remedies for transactions of this nature, plus as a default remedy, the Lender will have standing to cause the Debtor or trustee to engage in a process to liquidate its assets pursuant to Bankruptcy Code section 363. |
| **Conditions Precedent to Closing** | This DIP Commitment Letter is subject to, among other items, the following<br>1.     Court approval of the definitive documents for the DIP Loan;<br>2.     A certificate by the appropriate officer of the Debtor that all of the Representations and Warranties are true and correct as of the Closing Date; and<br>3.     Execution of definitive legal documentation acceptable to Lender in its sole discretion |

2.     In addition to the material terms discussed above, the Debtor has identified the below provisions of the Interim Order that are required to be highlighted pursuant to Local Rule 4001-4:

(a)     **New Security Interests (Local Rule 4001-4(b)(1))**: Under the Interim Order, the Lender is granted a lien in postpetition assets in which the Pre-petition Secured Lenders would not otherwise have a security interest by and applicable law.

3.     After a series of good faith, arm's-length negotiations, the Debtor entered into the *DIP Loan Proposal* letter (the "**DIP Commitment Letter**"), a copy of which is attached hereto as Exhibit B, with the Lender. The parties have yet to enter into a formal DIP credit agreement. By

5

PHOENIX/642212.1/396239
Case 2:13-bk-14269-EPB    Doc 4    Filed 08/19/13    Entered 08/19/13 12:02:15    Desc
Main Document    Page 5 of 18

the Interim Order, the Debtors request that the Court, among other things, (i) approve the terms of the DIP Commitment Letter and (ii) authorize the Debtors to execute and deliver the DIP credit agreement,[2] all agreements, documents, and instruments contemplated by each (collectively, the "**DIP Documents**"), which shall be subject to the Court's approval at the Final Hearing. Accordingly, the Court's interim approval of the DIP Loan shall be limited to the terms of the DIP Commitment Letter and the Interim Order. Because the Debtor is initially only seeking interim relief, the Court and other parties-in-interest will have an opportunity to review the terms of the DIP Commitment Letter and the proposed Final Order prior to the Final Hearing. The Debtor respectfully requests a Final Hearing on or before August 20, 2013, to seek final approval for the DIP Loan. If approved on a final basis, the DIP Loan would provide a total of up to $125,000.00to fund certain of the Debtor's operations and outlined above pending the anticipated sell of the Debtor's business.

## BACKGROUND

**Jurisdiction and Venue**

4. The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1330 (the "Bankruptcy Code") on July 31, 2013 (the "Petition Date"). The Debtor continues to operate its business and possess its property as debtor-in-possession in accordance with Bankruptcy Code §§ 1107 and 1108.

5. This Court has jurisdiction over these Chapter 11 proceedings under 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding under 28 U.S,C, S 157(b)(2).

6. The Debtor maintains primary operational places of business in Phoenix, Arizona. Accordingly, venue of the Debtor's Chapter 11 proceeding is proper in this District under 28 U.S.C. §§ 1408 and 1409.

---

[2] Under the DIP Commitment Letter, the Lender reserves the right, in its sole discretion, to have the DIP Commitment Letter serve as the DIP Credit Agreement.

7. The statutory predicates for the relief requested in this Motion are Bankruptcy Code §§ 105 and 507(a)(4).

**General Background About Debtor**

8. Casa de Capri Enterprises, LLC (Capri) operates as a for-profit, skilled nursing facility providing post-acute care to people (including many indigent patients provided medical care through Arizona Health Care Cost Containment System, or "AHCCCS" as more fully described below) in Maricopa County and particularly the Phoenix, Arizona area. The Debtor currently has approximately 150 full- and part-time employees.

9. This skilled nursing facility known as Capri was originally built in the 1960's and was operated by the Fay family as a nursing home focused on the long-term care needs of individuals unable to fully take care of themselves. The facility was expanded in the 1980's to increase the number of beds. In January, 2008, the business was purchased (but not the real estate) and over the next few years, transformed into a sub-acute and rehabilitation facility with programs developed specifically to treat patients with complex medical needs, including wound care, respiratory services, bedside dialysis, and extensive therapeutic services. To this end, in 2011, over $1 million was invested in updating and remodeling the original building in order to more adequately provide skilled nursing care for patients that need physical, occupational, and speech therapy rehabilitation services.

10. Today, the facility consists of 133 licensed skilled nursing beds. The facility is sub-leased from Legacy Senior Housing and Development, LLC ("Legacy"). "Legacy" leases the facility from Fay Enterprises, Inc.

11. After the remodel project was completed in 2011 and Capri was able to treat sub-acute patients, the Debtor was forced to accept sub-standard rates from managed care organizations due to the facility's new entry into this specialized market. It was envisioned that

7

over time and with experience and increased marketing clout, Capri could re-negotiate more favorable market rates. However, the Debtor went through a series of CEO's (licensed administrators) who were unable to successfully negotiate higher and thus profitable reimbursement rates from the managed care organizations that managed most of the Debtor's patients. Due to these substandard reimbursement rates received for patients needing the type of skilled care Capri specializes in, the Debtor has been forced to accept other low reimbursement-rate patients to raise the census of daily patients toward the break-even point of operations. This has led to an undesirable mix of patient reimbursement rates and a true struggle to achieve profitability on a regular monthly basis.

12. Over this same time period the AHCCCS managed contract holders set a goal to move as many patients from skilled nursing environments such as the Debtor's, to home health care, group homes and assisted living facilities. This created an oversupply of skilled nursing beds. This has exacerbated the Debtor's inability to increase the census high enough to reach profitability.

13. The aging condition of the facility requires regular maintenance. In addition, since some of the HVAC equipment and plumbing is original to the initial construction and enlargement of the facility, simple repairs are no longer feasible. Instead, major repairs and in some cases unexpected outright replacement of aged mechanical equipment has had to be undertaken recently in such key areas of infrastructure as ventilation, air conditioning, plumbing, kitchen equipment, electric delivery, and waste removal. Keeping up with maintenance and unexpected repairs has placed a further strain on the Debtor's finances.

14. Since the beginning of 2013, Capri has undertaken a number of actions to reach profitability including the following:

A) A seasoned Administrator with a history of successful turn-arounds was hired and granted the ability to make dramatic changes in the operations of Capri.

B) Key leadership positions in clinical, admissions, marketing and business operations were replaced.

C) A small dedicated team was created to focus on accounts receivables clean-up and collections.

D) The sales and marketing team has been expanded to raise Capri's presence in the marketplace.

E) Costs have been more closely managed by freezing wages, reducing staff, negotiating with vendors, and instituting a more diligent expenditures approval process.

15. In addition, The Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat 119-1025 (2010) also known as Obamacare, is believed by many healthcare industry consultants to be a potential cause in forcing smaller, stand-alone facilities to merge with larger operators to survive.

16. In February, 2009, Capri's Business Office Manager, Lorie Singer, was terminated when it was discovered that over the course of more than one year, she had misappropriated over $214,000 from a variety of sources from Capri, including the operating fund, payroll account, petty cash and resident trust accounts. Upon her termination, the trust accounts were reconciled and made whole by Capri, but our ability to service our accounts payables were negatively impacted causing late payments and less favorable credit terms. She was eventually convicted of committing a felony.

17. One of the key responsibilities of the Business Office Manager was overseeing the patient billing and collections processes. With her sudden departure and the time invested to

9

research her embezzlement activities, Capri's focus and ability to properly capture and bill insurance companies for covered patient services was severely retarded. Proper and timely filing of claims has a "snowball" effect on accounts receivables and unfortunately, once submission deadlines have been missed, there is no opportunity for recapture and the fee for the Debtor's legitimate services rendered becomes uncollectable revenue. This has resulted in higher write-offs, diminishing collections and therefore the Debtor's ability to pay.

18. The Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119-1025 (2010), also known as Obamacare, is believed by many healthcare industry consultants to be a potential cause in forcing smaller, stand-alone hospitals to merge with larger hospital systems in order to survive.

19. No single event has caused the Debtor to seek relief under Chapter 11 of the Bankruptcy Code. The low census, damaged working relationships with key vendors, unplanned investments in plant and equipment, low contract reimbursement rates and impending further cuts expected by continued changes in the Medicare and Medicaid (CMS) regulations and reimbursements have all contributed to the progressive financial decline of Capri.

20. In May of this year Capri informed its landlord that it could no longer operate the facility. The landlord found another operator willing to take over the property lease.

21. Capri will be forced to cease operations if the Court does not approve the DIP Loan and the use of Cash Collateral. .

22. The Debtor has $1,850,000 in secured claims and $1,500,000 in unsecured debt.

23. The Debtor has $3,100,000 in accounts receivables due from insurance companies, Medicare, taxing authorities, private pay patients and miscellaneous sources. Of those receivables $600,000 are deemed to be bad debt and uncollectible. Most of the bad debt comes from non-reimbursed co-payments due from patients.

10

24. The objective of this Chapter 11 filing is to orderly collect the claims and pay first the secured and then the unsecured debts on a prorated basis. In order to collect the receivables the company must have access to and use medical records and maintain contracts with the insurance companies.

## **RELIEF REQUESTED**

25. By this Motion, Debtor requests that this Court enter the DIP Orders granting the following relief:

(a) Authorizing the Debtor to enter into the DIP Loan in a principal amount not to exceed $125,000.00pursuant to the terms and conditions of the DIP Commitment Letter;

(b) Authorizing the Debtor to execute and deliver a DIP credit agreement and all additional DIP Documents and to take all actions necessary, appropriate or required to comply with the Debtor's obligations thereunder and under the DIP Orders;

(c) Authorizing the Debtor to grant the Lender, senior, first-priority, priming liens on the DIP Loan Collateral, and superpriority claims in respect of, the DIP Loan;

(d) Authorizing the Debtor to use cash on hand, cash proceeds of prepetition collateral and other cash that constitutes the Pre-Petition Secured Creditors' cash collateral;

. (e) Approving the form of the adequate protection to be provided to the Pre-Petition Secured Creditors to protect the Pre-Petition Secured Creditors' interests in the prepetition collateral, pursuant to §§ 361, 362 and 363;

(f) Approving the procedure proposed herein for filing and noticing the executed DIP credit agreement and proposed Final Order;

(g) Scheduling the Final Hearing on this Motion to consider entry of the Final Order; and;

(h) Granting related relief; and;

11

## BASIS FOR RELIEF

26. In Debtor's business judgment, Lender provides one of the few, if not only, opportunities to secure post-petition financing – a necessity if the Debtor is to avoid ceasing operations entirely.

27. It is critically important the Debtor be maintained as a "going concern" and remain operating. As such, Lender has expressed its desire that, among other things, patient care be maintained as part of the going concern value of the assets to be acquired. Anderson Affidavit.

28. Maintenance of the patient care of Debtor is not only essential for subsequent consummation of any sale agreement (or indeed, any acquisition by any strategic buyer), but is also of critical importance for obvious reasons: Debtor is a healthcare provider, and owes a legal and moral duty to its patients to continue an uninterrupted standard of quality and adequate care. Failure to do so could create legal liability, and also irrevocably injure its longstanding relationship with AHCCCS and the state and federal regulatory authorities. (*Id.*) Funds to be provided under the DIP Loan will be used to preserve the value of the Debtor's estate for the benefit of all creditors and other parties-in-interest.

### Approval of the DIP Loan Under §§ 364(c) and (d).

29. Terms of the DIP Commitment Letter are fair, reasonable, and adequate. Substantially all of the Debtors' assets are encumbered by prepetition liens in favor of the Pre-Petition Secured Creditors.. Despite the diligent efforts of the Debtor and its advisors, it is prohibitively unlikely that the Debtor could obtain postpetition financing on any other terms. The DIP Loan is a product of good faith, arm's-length negotiations with the Lender and reflects terms that are fair, reasonable and adequate under the circumstances.

30. Absent an expedited sale of assets of to a financially viable buyer, continued and sustained operations will be difficult at best, and more likely than not a practical impossibility.

As a result of the financial challenges of Debtor's operations, relationships with many key vendors have become strained, and (absent a sale), maintaining the flow of goods and services from these key vendors will be more and more difficult. Lender has agreed to advance funds under the DIP Loan to maintain patient care and pay liability insurance pending consummation of a sale. Without the DIP Loan, Debtor could not continue operations, and it would be irresponsible for the Debtor to cease care giving operations. Debtor, in its current independent state, does not have access to the capital required to restructure its delivery of care, or consolidate services to reduce costs. In sum, Debtor is a victim of the changing and changed economics of the healthcare industry.

31. The terms of the DIP Loan have been negotiated at arms' length and in good faith as that term is used in Section 364(e) of the Bankruptcy Code and are in the best interests of the Debtor, its estate and creditors. The Lender is extending the financing to the Debtor, and the use of the Pre-Petition Secured Creditors is necessary and critical. 32. The Debtor has not been able to, and believes it is impractical, for the Debtor to locate financing on terms more favorable than being offered by Lender in the DIP Commitment Letter.

33. As described above, after appropriate investigation and analysis, the Debtor has concluded that pursuing the DIP Loan with Lender is the best alternative available under the circumstances. Bankruptcy courts routinely defer to the Debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors vs. Chicago Mil. St. & Pac. Ry.,* 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) (business judgment should be left to the board room and not to the bankruptcy court); *In re Lifeguard Industries, Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). More exacting scrutiny would slow the administration of the Debtor's estate and increase the cost, interfere with the Bankruptcy Code's provisions for private control of administration of the

estates, and threaten the Court's ability to control a case impartially. *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

34. For these reasons, Debtor believes it absolutely critical that it have access to working capital while working to consummate a sale of assets The DIP Loan provides the means for Debtor to maintain its going concern value, and does so without requiring that Debtor seek permission to grant a priming lien over any third-party lien holder or provide adequate protection to third-party lien holders.

**Approval of Cash Collateral Use & Adequate Protection.**

35. In addition to the DIP Loan, the Debtor requires the use of cash or proceeds subject to the Pre-Petition Secured Creditors' (the "**Cash Collateral**") in order to meet the Debtor's cash needs. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use cash collateral with the consent of the secured party or upon court order. Section 363(e) of the Bankruptcy Code then requires that the debtor-in-possession adequately protect the secured creditor's interest in property to be used against any diminution in value resulting from the debtor's use.[3] What constitutes sufficient adequate protection is decided on a case-by-case basis, and can come in various forms, including payment of adequate protection fees, payment of interest, and granting of replacement liens and administrative claims.[4]

36. As set forth in detail in the Interim Order, the Debtor proposes to provide the Pre-Petition Secured Creditors with, among other things, several forms of adequate

---

[3] By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

[4] *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

14

protection to protect the Lender from any diminution of value in its prepetition collateral resulting from the Debtor's use, sale, or lease of such collateral and imposition of the automatic stay.

38. For example, the Debtors propose to provide the Pre-Petition Secured Creditors with payments upon receipt of the receivables. The debtor estimates the receivables which can be collected within the first sixty (60) days of the case exceed $2,200,000. The prepetition secured creditors are owed approximately $2,000,000 in the aggregate.

38. In addition to the adequate protection discussed above, the Bankruptcy Code permits the payment of adequate protection by granting creditors any relief that will result in the realization of the "indubitable equivalent" of such entity's interest in the property.[5] While the Bankruptcy Code does not define "indubitable equivalent", courts view this provision as a "catch-all" for any other form of adequate protection.[6] Courts have considered the preservation and enhancement of collateral to be a critical component of adequate protection. In determining the sufficiency of adequate protection, courts have considered "whether the value of the debtor's property will increase as a result of" the use of the postpetition financing.[7] In this case, the preservation of the collateral is futher adequate protection to the Lender.

---

[5] 11 U.S.C. § 361(3).
[6] *See In re Timbers of Inwood Forest, Assocs. Ltd.*, 793 F.2d 1380, 1388 (5th Cir. 1988) (describing § 361(3) as a "catch-all" provision).
[7] *495 Cent. Park*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (priming loan approved because it would improve collateral's value; "[t]his value will serve as adequate protection . . . ."); *see also In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr. D. Mass. 1991) (priming loan approved when "the chance of a decline in the value of the property is more than offset by the likelihood of enhancement in value due to the Debtor's construction and marketing plans."); *In re Sky Valley, Inc.*, 100 B.R. 107, 114

15

39. In light of the foregoing, the Debtor submits that the proposed adequate protection for the benefit of the Lender is necessary and appropriate under the circumstances of this chapter 11 case. Accordingly, the adequate protection proposed in this Motion and in the DIP Orders is fair and reasonable and sufficient to satisfy the requirements of §§ 363(c)(2) and (e).

## NOTICE AND REQUEST FOR FINAL HEARING

40. Under Rule 4001(c)(2), the Debtors requests the Court to set a date for the Final Hearing. Notice of this Motion has been given by e-mail, facsimile, overnight delivery, and/or courier to the following parties or, in lieu thereof, to their counsel, if known: (i) Debtor's 20 largest unsecured creditors, (ii) the Lender, (iii) the United States Trustee for the District of Arizona (the "**U.S. Trustee**"); (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) all other secured creditors; and (vii) any lessor of real property to the Debtor, The Pre-Petition Secured Creditors. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NECESSITY FOR IMMEDIATE RELIEF

41. Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant … (b) a motion to use, sell, lease or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition …." Absent immediate access to the Cash Collateral and

---

(Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection.") (citation omitted), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

16

proposed debtor-in-possession financing, the Debtor will not be able to meet payroll or maintain utility services on an uninterrupted basis. Such circumstances would result in an immediate disruption to the Debtor's operations, the Debtor's inability to continue provision of health care services to existing patients, and irreparable harm to the Debtor's estate. Accordingly, the relief requested herein is consistent with Rule 6003 and this Court should authorize the Debtor to utilize the Cash Collateral and borrow an amount sufficient under the Budget to fund its operating expenses pending the Final Hearing on this Motion.

## **CONCLUSION**

WHEREFORE, Debtor respectfully requests that the Court enter the Interim Order, substantially in the form attached as **Exhibit A:** (a) granting the relief requested in this Motion; and (b) providing any additional relief the Court deems appropriate.

DATED this 19th day of August, 2013.

                          MICHAEL W. CARMEL, LTD.

               /s/Carmel, M.W.  (007356)
                  Michael W. Carmel
                  80 East Columbus Avenue
                  Phoenix, Arizona  85012-2334
                  Proposed Attorney for Debtor

COPY of the foregoing mailed
this 19th day of August, 2013 to:

Elizabeth Amorosi, Esq.
Office of the U.S. Trustee
230 N. First Avenue
Phoenix, AZ  85003

Christopher Simpson, Esq.
STINSON MORRISON HECKER, LLP
1850 N. Central Ave., Suite 2100
Phoenix, AZ  85004-4584

17

PHOENIX/642212.1/396239
Case 2:13-bk-14269-EPB    Doc 4    Filed 08/19/13    Entered 08/19/13 12:02:15    Desc
Main Document    Page 17 of 18

| | |
|---|---|
| 1 | Tamalyn Lewis, Esq. |
| 2 | Ridenour, Hienton & Lewis PLLC<br>201 N. Central Ave., Suite 3300 |
| 3 | Phoenix, AZ 85004-1052 |
| 4 | Pre-Petition Secured Creditors |
| 5 | |
| 6 | By _*Sharon D. Kirby*_ |