Law Offices of
**MICHAEL W. CARMEL, LTD.**
80 East Columbus Avenue
Phoenix, Arizona 85012-2334
Telephone: (602) 264-4965
Arizona State Bar No. 007356
Facsimile: (602) 277-0144
E-mail: Michael@mcarmellaw.com

Proposed Attorney for Debtor

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>CASA de CAPRI ENTERPRISES, LLC<br>dba Capri at the Pointe Rehab,<br><br>Debtor. | Chapter 11 Proceedings<br><br>Case No. 2:13-bk-14269-EPB<br><br>**DECLARATION OF GREGORY S. ANDERSON IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS** |

GREGORY S. ANDERSON, under penalty of perjury, states:

1. I am a Member of Casa de Capri Enterprises, LLC dba Capri at the Point Rehab (the "Debtor").

2. As the Debtor's Member, I am generally familiar with the Debtor's business and financial affairs. I submit this Declaration based upon my personal knowledge as the Debtor's CEO in connection with the Debtor's Voluntary Petition for Relief Under Chapter 11 of the United States Bankruptcy Code filed on August 19, 2013 (the "Petition Date"). The statements set forth below are true to the best of my personal knowledge, and I am competent to testify as to the validity of these statements if called to do so.

3. This Declaration is supported in support of the factual allegations contained in the following Motions (the "First Day Pleadings") filed contemporaneously with this Declaration:

(a) Debtor's Emergency Motion for an Order Authorizing Debtor to Pay Prepetition Wages and Salaries and to Honor Prepetition Checks Issued to Employees.

(b) Debtor's Emergency Motion for to Approve Debtor-in-Possession Financing.

## Description of the Debtors

4. Casa de Capri Enterprises, LLC (Capri) operates as a for-profit, skilled nursing facility providing post-acute care to people (including many indigent patients provided medical care through Arizona Health Care Cost Containment System, or "AHCCCS" as more fully described below) in Maricopa County and particularly the Phoenix, Arizona area. The Debtor currently has approximately 140 full- and part-time employees.

5. This skilled nursing facility known as Capri was originally built in the 1960's and was operated by the Fay family as a nursing home focused on the long-term care needs of individuals unable to fully take care of themselves. The facility was expanded in the 1980's to increase the number of beds. In January, 2008, the business was purchased (but not the real estate) and over the next few years, transformed into a sub-acute and rehabilitation facility with programs developed specifically to treat patients with complex medical needs, including wound care, respiratory services, bedside dialysis, and extensive therapeutic services. To this end, in 2011, over $1 million was invested in updating and remodeling the original building in order to more adequately provide skilled nursing care for patients that need physical, occupational, and speech therapy rehabilitation services.

6. Today, the facility consists of 133 licensed skilled nursing beds. The facility is sub leased from Legacy Senior Housing and Development, LLC. "Legacy" leases the facility from Fay Enterprises.

7.  After the remodel project was completed in 2011 and Capri was able to treat sub-acute patients, the Debtor was forced to accept sub-standard rates from managed care organizations due to the facility's new entry into this specialized market. It was envisioned that over time and with experience and increased marketing clout, Capri could re-negotiate more favorable market rates. However, the Debtor went through a series of CEO's (licensed administrators) who were unable to successfully negotiate higher and thus profitable reimbursement rates from the managed care organizations that managed most of the Debtor's patients. Due to these substandard reimbursement rates received for patients needing the type of skilled care Capri specializes in, the Debtor has been forced to accept other low reimbursement-rate patients to raise the census of daily patients toward the break-even point of operations. This has led to an undesirable mix of patient reimbursement rates and a true struggle to achieve profitability on a regular monthly basis.

8.  Over this same time period the AHCCCS managed contract holders set a goal to move as many patients from skilled nursing environments such as the Debtor's, to home health care, group homes and assisted living facilities. This created an oversupply of skilled nursing beds. This has exacerbated the Debtor's inability to increase the census high enough to reach profitability.

9.  The aging condition of the facility requires regular maintenance. In addition, since some of the HVAC equipment and plumbing is original to the initial construction and enlargement of the facility, simple repairs are no longer feasible. Instead, major repairs and in some cases unexpected outright replacement of aged mechanical equipment has had to be undertaken recently in such key areas of infrastructure as ventilation, air conditioning, plumbing, kitchen equipment, electric delivery, and waste removal. Keeping up with maintenance and

3

unexpected repairs has placed a further strain on the Debtor's finances. Since the beginning of 2013, Capri has undertaken a number of actions to reach profitability including the following:

   A) A seasoned Administrator with a history of successful turn-arounds was hired and granted the ability to make dramatic changes in the operations of Capri.
   B) Key leadership positions in clinical, admissions, marketing and business operations were replaced.
   C) A small dedicated team was created to focus on accounts receivables clean-up and collections.
   D) The sales and marketing team has been expanded to raise Capri's presence in the marketplace.
   E) Costs have been more closely managed by freezing wages, reducing staff, negotiating with vendors, and instituting a more diligent expenditures approval process.

10. In addition, The Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat 119-1025 (2010) also known as Obamacare, is believed by many healthcare industry consultants to be a potential cause in forcing smaller, stand-alone facilities to merge with larger operators to survive.

11. In February, 2009, Capri's Business Office Manager, Lorie Singer, was terminated when it was discovered that over the course of more than one year, she had misappropriated over $214,000 from a variety of sources from Capri, including the operating fund, payroll account, petty cash and resident trust accounts. Upon her termination, the trust accounts were reconciled and made whole by Capri, but our ability to service our accounts payables were negatively impacted causing late payments and less favorable credit terms. She was eventually convicted of committing a felony.

4

12. One of the key responsibilities of the Business Office Manager was overseeing the patient billing and collections processes. With her sudden departure and the time invested to research her embezzlement activities, Capri's focus and ability to properly capture and bill insurance companies for covered patient services was severely retarded. Proper and timely filing of claims has a "snowball" effect on accounts receivables and unfortunately, once submission deadlines have been missed, there is no opportunity for recapture and the fee for the Debtor's legitimate services rendered becomes uncollectable revenue. This has resulted in higher write-offs, diminishing collections and therefore the Debtor's ability to pay.

13. The Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119-1025 (2010), also known as Obamacare, is believed by many healthcare industry consultants to be a potential cause in forcing smaller, stand-alone hospitals to merge with larger hospital systems in order to survive.

**Events Leading to Chapter 11 Filing**

14. No single event has caused the Debtor to seek relief under Chapter 11 of the Bankruptcy Code. The low census, damaged working relationships with key vendors, unplanned investments in plant and equipment, low contract reimbursement rates and impending further cuts expected by continued changes in the Medicare and Medicaid (CMS) regulations and reimbursements have all contributed to the progressive financial decline of Capri.

15. In May of this year Capri informed its landlord that it could no longer operate the facility. The landlord found another operator willing to take over the property lease.

16. The Debtor has $1,850,000 in secured claims and approximately $4,000,000 in unsecured debt.

17. The Debtor has approximately $2,900,000 in accounts receivables due from insurance companies, Medicare, taxing authorities, private pay patients and miscellaneous

5

Case 2:13-bk-14269-EPB    Doc 7    Filed 08/19/13    Entered 08/19/13 12:11:14    Desc
Main Document    Page 5 of 9

sources. Of those receivables $600,000 are deemed to be bad debt and uncollectible. Most of the bad debt comes from non-reimbursed co-payments due from patients.

18. The objective of this Chapter 11 filing is to orderly collect the claims and pay first the secured and then the unsecured debts on a prorated basis.

**Motion for an Order Approving the Sale of the Facility and Leasehold**

19. To my knowledge Pointe Healthcare, L.L.C, the proposed Purchaser under the Asset Purchase Agreement attached to the Sale Motion is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and there is no known basis for the Bankruptcy Court's refusal to approve the Asset Purchase Agreement or for the sale pursuant to 11 U.S.C. § 363 to be reversed or modified. A sale of the Facility is the only mechanism by which unsecured creditors will receive any recovery on their claims. Secured creditors are anticipated to be paid in full. The only alternative to a sale would be closure of the Facility, which would have a serious detrimental impact on (1) patients; (2) employees; and (3) creditors.

20. Greg Anderson and Michelle Anderson consent to the proposed sale of the Facility and the Leasehold, as those terms are defined in the Asset Purchase Agreement, free and clear of any claims, liens, encumbrances or interests we may hold in those assets

**Emergency Motion to Obtain Post-Petition Financing**

21. The Debtor's operations depend on sufficient resources to pay employees, acquire medical supplies, and otherwise provide services in order to properly run a hospital.

22. Based on the budget, it is expected the Debtor will experience shortfalls necessitating additional financing contemplated by the Motion.

6

23. The Debtor is in the process of finalizing a post-petition financing agreement with Fay Enterprises ("Fay") that will grant the Debtor a credit line of $200,000.00 necessary to maintain the Debtor's ongoing operations, preserve its going concern value, and allow the Debtor to continue to operate its business post-petition so a sale of substantially all of the Debtor's assets can be consummated. The proposed Interim funding will be $100,000. The interest rate is ten percent (10%) *per annum*.

24. The post-petition lien would be entitled to super-priority status.

25 The proposed Debtor-in-Possession financing is necessary to keep the Debtor operational while a sale of the Debtor's assets as a going concern is finalized. Having an assured cash flow allows the Debtor to encourage employees and vendors to continue to deal with the Debtor as a going concern. This will maximize recovery to the creditors.

26. The proposed budget contains conservative assumptions of payments by customers.

27. The Debtor has determined this proposed post-petition DIP financing is absolutely necessary to maintain the Debtor's business relationships with vendors, suppliers, and employees, as well as to meet its working capital needs. To ensure that this Chapter 11 case proceeds optimally, the Debtor has concluded that obtaining post-petition financing is necessary and in the best interest of the Debtor and its estate.

28. Indeed, without the post-petition financing, the Debtor will most likely be left with no alternative but to immediately cease operations, which would be a detriment to employees and creditors.

29. The Debtor's ability to incur this post-petition debt is integral to the success of this case.

30. The Debtor has been unable to receive more favorable terms than those being negotiated with Fay.

31. The Debtor cannot find a Debtor-in-Possession lender willing to extend credit to the Debtor on an unsecured basis allowable under Section 503(b)(1) of this title as an administrative expense.

32. Fay's proposal is reasonable under the circumstances. It is not anticipated the new lien will affect any parties' security interest.

**Motion for Order Authorizing Payment of Pre-Petition Wages and Salaries**

**And to Honor Pre-Petition Checks Issued to Employees**

33. The Debtor employs approximately 140 full-time employees as of the Petition Date (the "employees"). All of the employees are located at the hospital in Douglas, Arizona. The employees perform a variety of critical functions. Without the continued service of these employees, preserving the value of the estate will not be possible. Replacing these skilled and knowledgeable employees, particularly given the Debtor's remote location, would be impossible.

34. The Debtor anticipates that accrued pre-petition obligations owing to the employees will be substantially less than the statutory cap of $11,725.00 for priority treatment established by Bankruptcy Code §§ 507(a)(4) and (a)(5).

35. The relief requested by this Motion will significantly reduce the administrative burden that might otherwise be imposed in this case. The compensation, benefit and reimbursement amounts that the Debtor seeks to pay to the employees constitute priority claims under Sections 507(a)(4) and (5).

36. The employees are paid on a semi-monthly basis. The Debtor remained current with all payroll obligations to the employees through the last pay period which ended July 31, 2013. All pre-petition payroll taxes have been paid.

37. The current pay period ended August 15, 2013. Payroll obligation, including payroll taxes for that pay period are scheduled for payment on August 20, 2013.

38. Accordingly, the Debtor seeks authority to continue to honor and process the pre-petition obligations with respect to the payroll taxes and additional withholdings post-petition, in the ordinary course of business.

DATED: August 19, 2013.

    /s/ Gregory S. Anderson
GREGORY S. ANDERSON

COPY of the foregoing emailed
this 19th day of August, 2013 to:

Elizabeth Amorosi, Esq.
Larry Watson, Esq.
Office of the U.S. Trustee
230 N. First Avenue
Phoenix, AZ 85003

By *Sharon D. Kirby*